1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| MAYES AL-MOHAMAD,<br><br>                    Plaintiff,<br><br>        v.<br><br>STATE OF WASHINGTON STATE<br>PATROL,<br><br>                    Defendant. | CASE NO. 3:22-cv-05011-RJB<br><br>ORDER ON DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT |

11
12
13
14
15
16
17
18

        This matter comes before the Court on the Defendant State of Washington State Patrol's ("WSP") Motion for Summary Judgment.  Dkt. 33.  The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

19
20
21
22
23
24

        In this case, the Plaintiff, a probationary employee, asserts that the WSP discriminated against her, fired her in retaliation for protected activity, and subjected her to a hostile work environment contrary to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and the Washington Law Against Discrimination, RCW 49.60, *et. seq.* ("WLAD"). Dkt. 1.  The Plaintiff is a Muslim woman whose national origin is Arab (Jordanian).  Dkt. 16.

WSP now moves for summary judgment.  Dkt. 33.  For the reasons provided below, the motion (Dkt. 33) should be granted, in part, and although the Plaintiff's required showing is very thin, the motion (Dkt. 33) should be denied, in part.

## I.   RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  FACTS

On June 17, 2019, the Plaintiff was hired as a Communications Officer ("CO") with the WSP for the Marysville, Washington office.  Dkt. 33-1 at 7.  She was a one-year probationary employee.  *Id.*  COs answer 9-1-1 calls, initiate emergency services (like the police, medical aid, or a tow truck), talk on the radio to authorized users, and update WSP troopers on the traffic.  *Id.* at 10-11.

#### 1.  Plaintiff's Training Related Claim

In July or August of 2019, the Plaintiff was in a Shelton, Washington training session about terrorist attacks lead by Randayl Balogh, a WSP employee who was not the Plaintiff's supervisor.  Dkts. 37-1 at 5 and 33-1 at 35.  According to the Plaintiff, during this training, while addressing the class, Ms. Balogh "stated that 'anyone can convert and become a terrorist.'"  Dkt. 37-1 at 5.  While conceding that Ms. Balogh did not mention religion, the Plaintiff felt that, by using the word "convert," she meant religion.  *Id.*  Ms. Balogh did not make any other comments that offended the Plaintiff.  *Id.*  The Plaintiff reported the comment to her direct supervisor CO3 Brittany Krajcar and explained why the comment offender her.  *Id.* at 7.  CO3 Krajcar reported the incident to her superior, station commander CO4 Andrea Marlow.  *Id.* at 8. (CO4 Marlow reported to Heather Anderson, the division commander.  Dkt. 37-3 at 4.)  According to CO4 Marlow, as a station commander, she was a "fact gatherer" when complaints were made.  *Id.*

CO4 Marlow reported the Plaintiff's complaint to Division Commander Anderson, who coordinated with the trainers to make changes to the terrorism training.  Dkt. 37-5 at 12.

2.  <u>On-the-Job Training Session in Marysville</u>

The next time the Plaintiff asserts that she experienced harassment occurred during a radio operations training session with CO1 Melissa Myers.  Dkt. 37-1 at 8.  According to the Plaintiff, CO1 Myers "stated that "she wanted to blow up like a jihadi.'"  *Id.*  The Plaintiff reported this comment to her direct supervisor CO3 Krajcar.  *Id.* at 9.  CO3 Krajcar counseled CO1 Myers about it and Myers apologized to the Plaintiff.  *Id.*.  The Plaintiff and CO1 Myers worked together after that, and Myers did not make any other offensive comments.  *Id.* at 9-10.  Neither station commander CO4 Marlow nor division commander Anderson knew of this incident until after the Plaintiff was fired and an EEOC complaint was filed.  Dkts. 37-5 at 13-14 and 33-1 at 36.

3.  <u>License Plates</u>

According to the Plaintiff, the next time that she experienced harassment, occurred when a WSP trooper came into the radio center and in a "very aggressive, very intimidating, very angry" manner threatened to issue the Plaintiff a citation because she did not have a front license plate on her car.  Dkt. 37-1 at 11.  She states that he returned the next week "with the same aggression and hostility and he threatened to cite her."  *Id.*  CO1 Myers got up from her seat and asked him to leave.  *Id.* at 12.  The Plaintiff believes that the trooper's interaction with her was motivated by race because another co-worker, Heena Singh (a Hindu whose national origin is Indian), did not have a front license plate either.  *Id.*  The Plaintiff fails to point to any evidence that the trooper knew that Singh's car did not have front plates.  In any event, the Plaintiff reported her interactions with this trooper to supervisor CO3 Krajcar.  *Id.* at 13.  Krajcar reported

1    the incident to the trooper's sergeant.  *Id.*  The Plaintiff does not know what the trooper's

2    sergeant did with the report.  *Id.*  The Plaintiff had no further interactions with the trooper.  *Id.*

### 4.  Training with CO2 Ruth Benedict

4    The Plaintiff asserts that the next episode of harassment occurred during a training with

5    CO2 Ruth Benedict.  Dkt. 37-1 at 14.  According to the Plaintiff, CO2 Benedict "refused to train

6    [her] and said she does not understand [the Plaintiff's] English."  *Id.*  The Plaintiff acknowledged

7    that she "[didn't] know what motivated [Benedict]."  *Id.*  The Plaintiff reported this interaction

8    and CO2 Benedict apologized.  Dkt. 35 at 6.

### 5.  Plaintiff Reports Concerns Over Hostile Work Environment

10   The Plaintiff contends that in September of 2019 she spoke to direct supervisor CO3

11   Krajcar and station commander CO4 Marlow "regarding her concerns about a hostile work

12   environment."  Dkt. 37-1 at 18.  The Plaintiff asserts that she told them that "profanity was

13   pervasive," and "sexually explicit conversations" were taking place at work.  *Id.*

14   Supervisor CO3 Krajcar denied that the Plaintiff complained about profanity or sexually

15   explicit conversations.  Dkt. 33-1 at 92.  CO3 Krajcar contends that the use of profanity is

16   uncommon at work and while it is occasionally used, it can be grounds for discipline.  Dkt. 37-6

17   at 28.  She denies that sexually explicit conversations occur at work. *Id.*

18   Station commander CO4 Marlow denies that the Plaintiff reported to her that profanity

19   was being used or that sexually explicit conversations were occurring at the workplace.  Dkt. 33-

20   1 at 37.  CO4 Marlow states that she has never observed employees talking about sex at the

21   station, but has heard some profanity – "damn," "shit" and "once in a great while the 'f-bomb.'"

22   Dkt. 37-3 at 8.  CO4 Marlow maintains that if she heard sexual conversations at the office, she

would have addressed it or have a supervisor address it and would have reported it to human resources.  Dkt. 33-1 at 37.

6.   <u>Station Commander CO4 Marlow's Comments</u>

The Plaintiff states that right after the September 2019 discussion about the work environment, station commander CO4 Marlow began to make remarks like "your eyes are so beautiful," "you are so pretty," and "your smile makes my day."  Dkt. 37-1 at 33.  The Plaintiff asserts that CO4 Marlow has a low voice and the way she said those remarks made the Plaintiff uncomfortable.  *Id.*  The Plaintiff did not report CO4 Marlow's comments.  *Id.* at 35.

7.   <u>October Comment by Trooper Tyler Dalton</u>

October of 2019 was the next time the Plaintiff asserts she experienced harassment or discrimination.  Dkt. 37-1 at 16.  WSP Trooper Tyler Dalton, the Plaintiff, and a few others were discussing felons and people "with long rap sheets."  *Id.*  According to the Plaintiff, Trooper Dalton allegedly said something like "when you run the name Mohamad, you get like felonious returns."  *Id.*  The Plaintiff reported Trooper Dalton's statement to CO3 Krajcar, who, in turn, reported it to Trooper Dalton's sergeant.  *Id.* at 17.  Trooper Dalton was counseled, required to apologize to the Plaintiff, and he did so.  *Id.*  He did not make any further discriminatory or harassing statements to the Plaintiff and, according to the Plaintiff, they had a "friendly professional relationship" after that.  *Id.*

8.   <u>Performance Evaluations</u>

Supervisor CO3 Krajcar completed performance and Development Plan Evaluations on the Plaintiff for the periods June 17, 2019 to September 16, 2019 (Dkt. 33-1 at 69-72) and September 17, 2019 to December 16, 2019 (Dkt. 33-1 at 74-77).  CO3 Krajcar was pleased with

1  the Plaintiff's progress up to December 16, 2019 and had no serious concerns about the

2  Plaintiff's job performance.  Dkt. 37-6 at 25-26.

3          9.  <u>Shift Report in Late January 2020</u>

4          On January 20, 2020, shift supervisor CO3 Linda Spaetig sent an email to supervisor

5  CO3 Krajcar about the Plaintiff's performance.  Dkt. 33-1 at 104.  That report indicated that the

6  Plaintiff "still ha[d] lots of questions," made some errors entering information, and other co-

7  workers were complaining about the Plaintiff not answering the phones.  *Id.*

8          10.  <u>The Plaintiff Calls CO2 Flower Keffeler a "Cunt" and "White Supremacist"</u>

9          On January 29, 2020, in a text exchange with another coworker about work, the Plaintiff

10  called another communications officer, CO2 Flower Keffeler, a "cunt," a "nasty miserable old

11  hag" and a "white supremacist."  Dkt. 33-1 at 118.

12          11.  <u>Shift Reports in Late-January and Early-February 2020</u>

13          On Monday February 3, 2020, shift supervisor CO3 Spaetig sent another email to

14  supervisor CO3 Krajcar regarding the Plaintiff's work performance on January 31, 2020,

15  February 1, 2020 and February 2, 2020.  Dkt. 33-1 at 108.  CO3 Spaetig noted that the Plaintiff

16  did not react to an alert on her monitor, had her head down and that Spaetig "was not sure if [the

17  Plaintiff] was looking at her phone or what [the Plaintiff] was doing."  *Id.*  The email

18  documented that the Plaintiff made errors, appeared "confused," and that although her coworkers

19  really "like her" they would "shake their heads in disbelief when she [missed] basic stuff."  *Id.* at

20  108-109.  Shift supervisor CO3 Spaetig noted that the Plaintiff got frustrated when she didn't get

21  something correct and "it [came] across in her voice."  *Id.* at 108.

22          In the February 3, 2020 shift report, shift supervisor CO3 Spaetig noted errors by the

23  Plaintiff and other coworkers.  Dkt. 33-1 at 111.

24

12. <u>CO2 Keffeler Files a Harassment Complaint Against the Plaintiff for Calling her a "Cunt" and "White Supremacist" and Supervisor CO3 Krajcar Raises Concerns about Plaintiff's Performance</u>

On February 4, 2020, CO2 Keffeler emailed her shift supervisor, CO2 Timothy McDonald, and informed him that she was aware that the Plaintiff called her a "cunt" and made a reference to a "white supremacist."   Dkt. 37-10 at 2.  Keffeler indicated that she was offended and wanted management to talk to Plaintiff.  *Id.*  CO2 McDonald informed the Plaintiff's supervisor CO3 Krajcar and station commander CO4 Marlow.  *Id.*

On February 5, 2020 at 5:50 a.m., CO2 Keffeler filed a harassment complaint against the Plaintiff regarding the Plaintiff's text message calling Keffeler a "cunt," "nasty old hag," and "white supremacist."  Dkt. 33-1 at 122.  Keffeler's complaint was made on an "Internal Incident Report" form.  *Id.*

That same day, February 5 around 9:15 a.m., supervisor CO3 Krajcar emailed station commander CO4 Marlow concerns about the Plaintiff's performance that were on the computer system and observed by CO3 Spaetig and other co-workers.  Dkt. 33-1 at 125.  Station commander CO4 Marlow informed division commander Anderson about Plaintiff's text message and about Plaintiff's alleged performance issues.  *Id.*  Anderson asked CO4 Marlow to get further information.  Dkt. 37-5 at 19.

13. <u>February 5, 2020 Counseling Session with Supervisor CO3 Krajcar</u>

Supervisor CO3 Krajcar held a counseling session with the Plaintiff on February 5, 2020. Dkt. 37-1 at 21.  CO3 Krajcar told the Plaintiff that "she had been receiving numerous complaints" about the Plaintiff and they needed to discuss performance concerns.  *Id.*  They addressed the Plaintiff's "attitude and demeanor and following the correct procedures."  *Id.*  CO3 Krajcar states that the performance deficiencies were observed by shift supervisor CO3 Spaetig,

other coworkers, and "what was visible on the [computer-aided dispatch system ("CAD")]."

Dkt. 37-6 at 35.  CO3 Krajcar informed the Plaintiff that there had been complaints about her

being "rude" or "short" on the radio.  Dkt. 37-14 at 2.  CO3 Krajcar also counseled the Plaintiff

on officer safety during a felony robbery stop, on her response time to units, the importance of

broadcasting updates to units over the air, and not creating duplicate logs.  Dkts. 37-1 at 22 and

37-14 at 2.  (The Plaintiff asserts that she was not making all the mistakes that she was being

counseled on.  Dkt. 37-1 at 22.)  The Plaintiff was also told that, due to performance issues, her

smartwatch, phone and any other electronic devices had to be left in her locker.  Dkt. 37-1 at 24.

The Plaintiff maintains that she wasn't distracted by these devices.  *Id.* at 25.  The Plaintiff

contends that she told supervisor CO3 Krajcar that she felt "attacked and threatened" and did not

feel comfortable going into work.  *Id.* at 27.  By "attacked and threatened" the Plaintiff meant the

counseling on her work performance as well as the "nitpicking."  *Id.* at 32.  The Plaintiff did not

work the next day, February 6, 2020.  *Id.* at 28.

14. Handling of Complaints, the Office of Professional Standards, and CO2
    Keffeler's Complaint

According to division commander Anderson, when she receives a complaint, she

recommends that they try handling it at the lowest level first but if it is "pretty egregious . . . and

it violates any kind of policy" then it goes to the Office of Professional Standards.  Dkt. 37-5 at

8.  The Office of Professional Standards may handle it or may recommend that an investigation

go back to the division level to handle.  *Id.* The division level conducts interviews, keeps a case

log, and provides recommendations for how it should turn out.  *Id.*

In Plaintiff's case, on February 7, 2020, station commander CO4 Marlow reported CO2

Keffeler's complaint about the Plaintiff's calling Keffeler a "cunt" and "white supremacist" in a

text message to the WSP's Human Resources Division ("HR").  Dkts. 37-3 at 16; 37-2 at 9.

Later that day, John Matagi, in HR, responded by email, sent direction on how to discuss the incident with the victim (CO2 Keffeler), the alleged perpetrator (the Plaintiff), and witnesses. Dkt. 37-11 at 2. CO4 Marlow was directed to ask CO2 Keffeler how she wanted the situation resolved. *Id.*

HR referred the complaint to the Office of Professional Standards; it asked division commander Anderson to engage in a factfinding process. Dkt. 37-5 at 10. CO4 Marlow was also asked to help and during her fact gathering regarding the text message incident, she became aware that the Plaintiff made offensive comments on February 7, 2020 about her shift supervisor CO3 Spaetig. Dkt. 33-1 at 127-128.

### 15. Plaintiff Calls Shift Supervisor CO3 Linda Spaetig a "Cunt"

Meanwhile, also on February 7, 2020, the Plaintiff went to work, and a co-worker asked the Plaintiff how she was doing. Dkt. 37-1 at 28. The Plaintiff acknowledges that she responded, "I can't handle cunt Linda [Spaetig's] lies and harassment about me. It's a hostile work environment." Dkt. 33-1 at 60. (While the WSP asserts that the Plaintiff had an outburst in the call center and referred to several people there as "cunts," for purposes of this motion, the Court will only consider the statement about CO3 Spaetig to which the Plaintiff admits.) The Plaintiff concedes that "perhaps" other people in the communications center heard her call shift supervisor CO3 Spaetig a "cunt" because the statement occurred in the communications room. Dkt. 37-1 at 19.

### 16. Rumor about the Plaintiff and a Gift

The Plaintiff maintains that a few days before she was fired, Trooper Ryan Williams spread a rumor that the Plaintiff wanted to have sex with him. Dkt. 37-1 at 33. She contends

1   that another coworker gave her a pair of remote-controlled vibrating underpants, also just before

2   she was fired.  *Id.* at 34.  The Plaintiff did not report either of these events.  *Id.* at 35.

3                 17. <u>Factfinding Process and Harassment Board is Set</u>

4          Station commander CO4 Marlow's and division commander Anderson's factfinding

5   continued; Marlow created an investigator's case log and sent it to Anderson.  Dkt. 33-1 at 127-

6   128.  Division commander Anderson "built a clear case log of what actually, in [the staff's]

7   view, happened so that they could give [her] feedback."  Dkt. 37-5 at 10.  The Plaintiff was not

8   interviewed about the CO2 Keffeler incident because they were still investigating it when they

9   heard that the Plaintiff called shift supervisor CO3 Linda Spaetig a "cunt."  Dkts. 37-3 at 17 and

10   37-5 at 11.

11          According to division commander Anderson, once they finished in the factfinding

12   process, she, HR and the Office of Professional Standards decided the complaint needed to go to

13   a harassment board.  Dkts. 37-5 at 11 and 37-2 at 9.  WSP harassment boards are set up if there is

14   a complaint of "unwelcome, unwanted, or otherwise prohibited behavior."  Dkt. 37-2 at 5-6.

15   Moderate-level complaints are allowed to be handled locally by local supervisors or managers,

16   but a harassment complaint made to HR or the Office of Professional Standards always goes

17   through a harassment board.  Dkt. 37-2 at 7.  Since January 1, 2018, there have been 62 WSP

18   harassment boards.  *Id.* at 4-5.

19                18. <u>Harassment Board Meeting and the Plaintiff is Fired</u>

20          The harassment board, which included division commander Anderson, met.  Dkt. 37-5 at

21   24.  During that meeting, the board gave Anderson two options: fire the Plaintiff immediately or

22   let her continue her probationary period and continue with the Office of Professional Standards

23   investigation.  *Id.* at 25.  Division commander Anderson (in coordination with the harassment

24

board and in consultation with station commander CO4 Marlow) made the decision to fire the Plaintiff immediately.  Dkt. 37-5 at 24 and 37-3 at 31.  Division commander Anderson states that she fired the Plaintiff based on the text message that she sent about CO2 Keffeler and the February 7, 2020 statements made about shift supervisor CO3 Spaetig.  Dkt. 37-5 at 28-29.  Of the 62 harassment boards that have been convened, firing was recommended twice, and the Plaintiff's case was one of them.  Dkt. 37-2 at 16.

The Plaintiff was fired on February 12, 2020, with an effective date of February 20, 2020.  Dkt. 33-1 at 7 and 29.

**B. PROCEDURAL HISTORY**

The Plaintiff filed this case on January 10, 2022.  Dkt. 1.  She filed a Second Amended Complaint on May 31, 2022.  Dkt. 16.  Pursuant to Title VII and WLAD, the Plaintiff makes claims for sex, gender, race, religious, and national origin discrimination, retaliation and "sexual harassment and hostile work environment."  *Id.*

**II.      DISCUSSION**

**A. SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

1   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

2   metaphysical doubt").  Conversely, a genuine dispute over a material fact exists if there is

3   sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

4   the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986);

5   *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

6       The determination of the existence of a material fact is often a close question.  The court

7   must consider the substantive evidentiary burden that the nonmoving party must meet at trial,

8   which is a preponderance of the evidence in most civil cases.  *Anderson* 477 U.S. at 254.  The

9   court must resolve any factual issues of controversy in favor of the nonmoving party only when

10  the facts specifically attested by that party contradict facts specifically attested by the moving

11  party.  The nonmoving party may not merely state that it will discredit the moving party's

12  evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

13  *Elect.* at 630.  Conclusory, non-specific statements in affidavits are not sufficient, and "missing

14  facts" will not be "presumed."  *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871, 888–89 (1990).

15  **B.  DISCRIMINATION CLAIMS UNDER TITLE VII AND WLAD**

16      Both Title VII and the WLAD prohibit employer discrimination based on sex, gender,

17  race, religion, and national origin. 42 U.S.C. § 2000e-2(a)(1); RCW 49.60.180(3).  Employment

18  discrimination disparate treatment claims under Title VII and the WLAD, like the Plaintiff

19  makes here, are analyzed using the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973),

20  burden-shifting test. *Hittle v. City of Stockton, California*, 76 F.4th 877, 887 (9th Cir. 2023);

21  *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty*., 189 Wn.2d 516, 527 (2017).

22      Under the *McDonnell Douglas* test, a plaintiff alleging that an employer engaged in

23  discriminatory conduct adversely affecting their employment must first establish a prima facie

24

case. *Hittle* at 887. If a plaintiff makes a prima facie case of discrimination, in the second *McDonnell Douglas* step, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023)(*cleaned up*). Once "an employer articulates some legitimate, nondiscriminatory reason for the challenged action," in the third step, "the employee must show that the articulated reason is pretextual." *Id.*

### 1. Plaintiff's Prima Facie Case on Disparate Treatment

The prima facie case requires a plaintiff to show: (1) they are a member of a protected class; (2) they were performing satisfactorily; (3) they experienced an adverse employment action; and (4) similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Hittle* at 887. The first and third elements are uncontested here.

As to the second element, the Plaintiff has sufficiently shown that there are issues of fact as to whether she was performing satisfactorily. She received mixed job evaluations. The WSP argues that the Plaintiff was not performing satisfactorily because she violated several civility policies when she called a coworker and shift supervisor a "cunt." Dkt. 33. The Plaintiff notes that other workers who used profanity to describe other workers and supervisors and were not fired. Whether violation of WSP's civility policies based on profanity constitutes poor job performance is an issue of fact.

As to the fourth element of the prima facie case, "a plaintiff may demonstrate an inference of discrimination through comparison to similarly situated individuals, or any other circumstances surrounding the adverse employment action that give rise to an inference of discrimination." *Hittle* at 887.

The Plaintiff has made a sufficient showing as to the fourth element.  She argues that an inference of discrimination is warranted because other people in the office used profanity frequently and were not fired.  Further, she contends that unlike in her case, when she complained of offensive statements by others (e.g. statements by trainer Randyll Balogh, CO1 Myers, and Trooper Dalton) her complaints were handled informally (requiring only apologies) and not referred to the Office of Professional Standards.

The Plaintiff has met her burden on the prima facie case.

### 2.  WSP's Non-Discriminatory Reason for Firing the Plaintiff

Here, the WSP's burden "is one of production, not persuasion and involves no credibility assessment." *Opara* at 723.  The WSP contends that it fired the Plaintiff for calling coworker CO2 Keffeler a "cunt," "nasty old hag," and "white supremacist" in a text message and for calling shift supervisor CO3 Spaetig a "cunt."  It has produced a non-discriminatory reason for terminating the Plaintiff's employment.

### 3.  Plaintiff's Showing of Pretext

Since the WSP has met its burden to explain the Plaintiff's firing, the burden shifts back to the Plaintiff to show that the WSP's articulated reasons are pretextual.  *Opara* at 726.  As an example of pretext, the Plaintiff points out that on one occasion CO2 Benedict called CO3 Spaetig a "bitch" and only received a one-day suspension.  Dkt. 37-1 at 30.  Further, CO1 Singh received a written and verbal reprimand for saying "bitch" at work.  Dkt. 37-9 at 8.  Neither CO2 Benedict or CO1 Singh are Muslims and neither's national origin is Arab, unlike the Plaintiff.  The Plaintiff further asserts that unlike in CO2 Benedict's or CO1 Singh's cases, her conduct was referred to the Office of Professional Standards and a harassment board was convened.  Viewing the facts and reasonable inferences in a light most favorable to the Plaintiff, the WSP's

termination of the Plaintiff for using profanity to describe a coworker and supervisor when it did

not terminate other non-Muslim, non-Arab people, for using profanity to describe their

coworkers is evidence that their proffered reason was pretext for discrimination.  While the WSP

maintains that CO2 Benedict or CO1 Singh only used the term "bitch" and the Plaintiff used

"cunt" (which it contends is a significantly worse word and so merited a stronger response) that

is an issue of fact to be determined by a jury.  Further, whether the Plaintiff's status as a

probationary employee makes CO2 Benedict or CO1 Singh's situations different enough that

they are not proper comparators is an issue of fact.  The Plaintiff has met her burden of

producing evidence of pretext.

## C.  RETALIATION CLAIM

To make a claim for retaliation under Title VII or the WLAD, a plaintiff must make a

prima facie case showing: "(1) involvement in a protected activity, (2) an adverse employment

action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928

(9th Cir. 2000); *Mikkelsen* at 527.  If a plaintiff establishes a prima facie case on a Title VII or

WLAD retaliation claim, the *McDonnell Douglas* burden shifting test applies.  *Vasquez v. Co. of*

*Los Angeles*, 349 F.3d 634 (9th Cir. 2003); *Estevez v. Faculty Club of Univ. of Washington*, 129

Wash. App. 774, 797-798 (2005).

### 1.  Plaintiff's Prima Facie Case on Retaliation

The first and second element of the prima facie case are not in dispute here.  As to the

prima facie case's last element, causation, the required showing under Title VII and WLAD are

slightly different.  For purposes of the causation element, "Title VII retaliation claims require

proof that the desire to retaliate was the but-for cause of the challenged employment action."

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 (2013). "[T]his burden on the plaintiff

to establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer is more demanding than the motivating-factor standard." *Stilwell v. City of Williams*, 831 F.3d 1234, 1247 (9th Cir. 2016). For a retaliation claim under the WLAD, a plaintiff proves causation "by showing that retaliation was a substantial factor motivating the adverse employment decision." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 412 (2018).

The Plaintiff has pointed to facts, which if believed, would establish the but-for cause and substantial motivating factor cause for purposes of her Title VII and WSP retaliation claims. As stated above in Section II.B.'s discussion on the disparate treatment claim, the Plaintiff notes that other WSP workers have used profanity to describe other workers and were not fired. She points out that others about whom complaints were made did not have the complaints immediately forwarded to the harassment board. The Plaintiff also notes that of the 62 harassment boards that have been convened, only two have recommended firing, and the Plaintiff's case was one of those. These facts could be used to infer that the Plaintiff was fired because she complained frequently.

The Plaintiff has met the requirements of a prima facie case for her retaliation claims.

### 2.  WSP's Non-Retaliatory Reason

The burden now shifts to the WSP to point to a non-retaliatory reason for firing the Plaintiff. *Opara* at 723. Its proffered reason, that of the Plaintiff's use of profanity to describe a coworker and a shift supervisor, is a legitimate non-retaliatory reason to fire her.

### 3.  Plaintiff's Evidence of Pretext

The burden then shifts back to the Plaintiff to show that the WSP's proffered reason was pretext. *Opara* at 723. As stated in the Section II. B.'s discussion on disparate treatment, the

1   Plaintiff has proffered evidence, which if believed, could entitle a jury to conclude that the

2   WSP's reason for firing the Plaintiff was pretext.  Her retaliation claims should not be dismissed.

3   **D.  HOSTILE WORK ENVIRONMENT CLAIM**

4          To establish discrimination under a hostile work environment theory pursuant to Title VII

5   or WLAD, a plaintiff must show they were subjected to sex, race, religion or national origin-

6   based "harassment that was sufficiently severe or pervasive to alter the conditions of

7   employment, and that [their] employer is liable for this hostile work environment." *Christian v.*

8   *Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020); *Antonius v. King Cty.*, 153 Wash.2d 256

9   (2004). At issue here is whether any harassment was based on the Plaintiff's membership in a

10  protected class, whether the harassment was "severe or pervasive," and whether the WSP is

11  liable for it.

12          1.  Harassment based on Plaintiff's Membership in a Protected Class

13          A plaintiff bringing a Title VII "hostile work environment claim must show

14  discrimination on account of membership in a protected class." *Sharp v. S&S Activewear,*

15  *L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023).

16          While several of the incidents that the Plaintiff points to are arguably "on account of

17  membership in a protected class," she points to no evidence that the incident involving the

18  trooper threatening her with a ticket for not having a front license plate was such an occasion.

19  Further, she points to no evidence that CO2 Benedict's alleged statement that she could not

20  understand the Plaintiff's English was made "on account of membership in a protected class."

21  The Plaintiff acknowledges that she did not know what motivated CO2 Benedict.  Those two

22  incidents will not be analyzed further because they do not meet the first requirement that the

23  harassment was "on account of membership in a protected class." *Sharp* at 978.

24

**Hostile Work Environment - Religion, Race and/or National Origin.**  The Plaintiff points to several incidents she contends were harassment based on her religion, race and/or national origin.  These incidents: trainer Balogh's comment that "anyone can convert and become a terrorist," CO1 Myers' statement that "she wanted to blow up like a jihadi," and Trooper Dalton's statement that "when you run the name Mohamad, you get like felonious returns" are arguably "on account of" religion, race, and or national origin.

**Hostile Work Environment - Sex and/or Gender.** In regard to her hostile work environment based on sex, the Plaintiff further asserts that there were sexually explicit conversations at work, CO4 Marlow made remarks like "your eyes are so beautiful," "you are so pretty," and "your smile makes my day," and a few days before she was fired a trooper spread a rumor that she wanted to have sex with him, and a coworker gave her vibrating underwear.  Each of these is arguably "on account of" sex and/or gender.

2. <u>Severe or Pervasive?</u>

To determine whether the conduct was sufficiently severe or pervasive, all the circumstances are considered, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Christian* at 809 (*cleaned up*).  The "required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Id.*  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not sufficient to create an actionable claim under Title VII, but the harassment need not be so severe as to cause diagnosed psychological injury." *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 687 (9th Cir. 2017).  "The working environment must both subjectively and objectively be perceived as abusive, and the objective

1   analysis is done from the perspective of," in this case, a "reasonable" woman, Muslim, and

2   person whose national origin is Arab.  *See Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161

3   (9th Cir. 2017).

4         **Hostile Work Environment - Religion, Race and/or National Origin.**  There are issues

5   of fact as to whether the incidents she contends were harassment based on her religion, race

6   and/or national origin were sufficiently "severe or pervasive" enough to be actionable.  These

7   incidents: trainer Balogh's comment that "anyone can convert and become a terrorist," CO1

8   Myers' statement that "she wanted to blow up like a jihadi," and Trooper Dalton's statement that

9   "when you run the name Mohamad, you get like felonious returns" were perceived by the

10  Plaintiff as abusive and, arguably, an objective person could perceive them as abusive as well.

11        **Hostile Work Environment - Sex and/or Gender.**  The Plaintiff fails to show that there

12  are issues of fact as to whether CO4 Marlow's remarks "your eyes are so beautiful," "you are so

13  pretty," and "your smile makes my day" were either severe or pervasive enough to alter the

14  conditions of the Plaintiff's employment.  Additionally, a reasonable woman would not consider

15  them abusive, coming from another woman.

16        As another basis for her hostile work environment based on sex claim, the Plaintiff

17  argues that there were sexually explicit conversations occurring at work.  In her deposition, when

18  asked for an example, the Plaintiff states that one coworker told a story about how a date asked

19  her to "defecate" on him and another coworker told a story about giving "foot jobs."  Dkt. 37-1

20  at 18.  While these are inappropriate stories to relate at work, the record contains only two

21  stories.  The Plaintiff has not shown that these two stories were severe or pervasive enough to

22  unreasonably interfere with the Plaintiff's work performance.  To the extent that the Plaintiff

23

24

1   bases her hostile work environment claim on sexually explicit conversations at work, she has

2   failed to make a sufficient showing and her claim should be dismissed.

3        There are issues of fact regarding the other grounds to which the Plaintiff points for her

4   hostile work environment based on sex claim: the trooper's rumor (which began just before she

5   was fired) and the coworker's panty gift (given right before she was fired).  The Plaintiff

6   perceived these events as abusive and, arguably, an objective person could perceive them as

7   abusive as well.

8        3.   <u>WSP Liable?</u>

9        As to the third element of a hostile work environment claim, "[a]n employer may be held

10  liable for creating a hostile work environment either vicariously (i.e., through the acts of a

11  supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an

12  employee)."  *Fuller* at 1164.  In the absence of grounds for imposing vicarious liability, as here,

13  "an employer is liable for a hostile work environment created by a plaintiff's co-worker if the

14  employer knew, or should have known, about the harassment and failed to take prompt and

15  effective remedial action."  *Reynaga* at 689.  "An employer's prompt corrective response can

16  insulate an employer from liability."  *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 650 (9th Cir.

17  2021).  On the other hand, an employer may be held liable for an employee's actions "if, after

18  learning of the harassment, it failed to take prompt corrective measures that were reasonably

19  calculated to end the harassment."  *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1017 (9th

20  Cir. 2018).  "Remedial action must include some form of disciplinary measures, which must be

21  proportionate to the seriousness of the offense."  *Reynaga* at 689.

22        **Hostile Work Environment - Religion, Race and/or National Origin.**  The Plaintiff

23  has failed to point to sufficient issues of fact that the WSP's responses to her complaints about

24

1 the incidents related to her religion/race/national origin were not prompt or adequate.  After the

2 Plaintiff's complaint about the training comment, the WSP changed its training content.  When

3 the Plaintiff complained about CO1 Myers' statement that "she wanted to blow up like a jihadi,"

4 and Trooper Dalton's statement that "when you run the name Mohamad, you get like felonious

5 returns," they were both counseled and required (and did) apologize.  Further, none of these

6 people made an offensive remark to the Plaintiff again.  The unrebutted evidence is that WSP

7 took "prompt corrective measures" that "were reasonably calculated to end" - and did end - the

8 harassment.  *Campbell* at 1017.  WSP's disciplinary action, requiring apologies, was

9 "proportionate to the seriousness of the offense[s]" in each case. *Reynaga* at 689.  The Plaintiff's

10 hostile work environment based on her religion/race/national origin claim should be dismissed.

11    **Hostile Work Environment - Sex and/or Gender.**  The two remaining grounds for the

12 Plaintiff's sex/gender based hostile work environment claim are the rumor started by the trooper

13 that the Plaintiff wanted to have sex with him and the coworker's gift of vibrating underwear.

14    The Plaintiff acknowledges that she did not report the rumor or the vibrating underwear

15 gift because these events occurred right before she got fired.  To the extent she bases her hostile

16 work environment claim on these two events, her claim should be dismissed.  The Plaintiff fails

17 to point to any evidence that the WSP knew, or should have known, about these events. *Reynaga*

18 at 689.

19     4. <u>Conclusion on the Plaintiff's Hostile Work Environment Claim</u>

20    The Plaintiff's hostile work environment claim should be dismissed.  She has failed to

21 show that the incident involving the trooper threatening her with a ticket for not having a front

22 license plate or that CO2 Benedict's alleged statement that she could not understand the

23 Plaintiff's English was made "on account of membership in a protected class." *Sharp* at 978.

24

These incidents fail the first element for a hostile work environment.  The Plaintiff has failed to demonstrate that CO4 Marlow's remarks "your eyes are so beautiful," "you are so pretty," and "your smile makes my day" or the allegedly sexually explicit conversations occurring at work were either "severe or pervasive" enough to "unreasonably interfere with [the Plaintiff's] work performance. *Christian* at 809.  These incidents fail to meet to second element of a hostile work environment claim.  As to the third element, the Plaintiff has failed to demonstrate that the WSP should be held liable for the training comment, CO1 Myers' statement, or Trooper Dalton's statement because it took "prompt and effective remedial action." *Reynaga* at 689.  She further failed to demonstrate that the WSP knew, or should have known, about the rumor started by the trooper that the Plaintiff wanted to have sex with him or of the coworker's gift of vibrating underwear and so has not established facts on which the WSP could be held liable for those events.  *Id.*

Further, the Plaintiff further fails to demonstrate why all these events, even taken together, spread over several months would cumulatively result in a hostile work environment. Her hostile work environment claim should be dismissed.

### III.   ORDER

Therefore, it is hereby **ORDERED** that:

- The WSP's Motion for Summary Judgment (Dkt. 33) **IS:**
  - **GRANTED,** as to the Plaintiff's Title VII and WLAD based hostile work environment claims;
    - the Title VII and WLAD based hostile work environment claims **ARE DISMISSED**; and

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 22

o **DENIED** as to the Plaintiff's Title VII and WLAD based disparate

treatment and retaliation claims.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 8th day of February, 2024.

ROBERT J. BRYAN
United States District Judge